SECURITIES & EXCHANGE COMMISSION, Plaintiff,

v.

SAFETY FINANCE SERVICE, INC., et al., Defendants.

GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant-Appellee,

v.

Ben D. SISSON, Receiver for Safety Finance Service, Inc., Defendant-Appellant.

No. 80–3954.

United States Court of Appeals, Fifth Circuit.

April 26, 1982.

John J. Gillon, Jr., Robert J. Landry, Michael H. Ellis, New Orleans, La., for defendant-appellant.

Steven B. Witman, Gary M. Zwain, New Orleans, La., for defendant-appellee.

Before WISDOM, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This controversy emerges from a larger dispute between the Securities and Exchange Commission and Safety Finance Service, Inc. (SFSI). Appellant, the court-appointed receiver of SFSI (Receiver), contests the supervisory court's decision awarding $10,110.88 from the liquidation of a receivership asset to appellee General Motors Acceptance Corp. (GMAC) in satisfaction of a chattel mortgage. Deferring to the broad discretionary powers inherent in a court of equity, we affirm the court's order.

## I. The Facts

As the district court notes, the underlying facts are not seriously in dispute. On October 25, 1979, the district court issued a temporary restraining order and preliminary injunction enjoining SFSI, Jack Porobil, Jr., and others from committing any further violations of various federal securities laws. The court also appointed a receiver to assume control over SFSI's assets and to administer its affairs. On November 5, SFSI agreed to a consent judgment that permanently enjoined the corporation from engaging in any activities in violation of the federal securities laws, placed its assets in trust, and appointed appellant Ben Sisson as receiver. Two days later, codefendant Jack Porobil consented to a similar judgment placing virtually all of his personal and commercial assets into the receivership.

Several months prior to the onset of his troubles, Porobil had purchased a 1979 Chevrolet Corvette, making the down payment with a check for $4,769.83 drawn on one of his corporate affiliates later named in the trust. He had borrowed the balance of the purchase price from GMAC by executing a chattel mortgage on the car. The mortgage contained the customary proviso authorizing GMAC to initiate executory proceedings for seizure and sale of the Corvette if Porobil should default on his $11,165.40 promissory note. With GMAC thus secured, title to the car was given over to Porobil and Jack A. Porobil Enterprises, Inc., a bogus entity that never filed any articles of incorporation with the Secretary of State for Louisiana.

By January of 1980, Porobil had defaulted on his payments to GMAC. GMAC

promptly began executory proceedings in the civil district court for the Parish of Orleans, naming Porobil and "Porobil Enterprises" as defendants. The Civil Sheriff of Orleans Parish seized the Corvette.

Meanwhile, Melvin J. Hoerner, a friend of Porobil, ordered a cashier's check for $10,110.88 from the Century National Bank on February 4, 1980, and tendered it to GMAC in satisfaction of the mortgage as the full amount then owed. Precisely why Hoerner produced this sum for Porobil is not clear from the record. According to the Receiver, Porobil had persuaded Hoerner to pay off GMAC, obtain the car from the sheriff, sell it to a buyer that Porobil would procure, and give Porobil a commission on the sale. Hoerner quickly learned, however, that the Receiver had asserted a claim to the Corvette as an asset of the Porobil trust. So Hoerner then ordered Century National Bank to stop payment on the certified check, and the bank, surprisingly, complied. To complete the strange saga of this forlorn check, GMAC, on receiving the dishonored instrument from the bank, simply returned it to Hoerner at his request.

The following August, GMAC again attempted to obtain a sheriff's sale of the Corvette. On August 13, however, the Receiver obtained a temporary restraining order enjoining the sale. Eventually, GMAC and the Receiver agreed that the Receiver should sell the car to the highest bidder and pay the proceeds into the court's registry pending resolution of their dispute. Although the car finally sold for $10,700, it is the amount covered by GMAC's lien, $10,110.88, that still forms the object of the quarrel between the Receiver and GMAC.

The Receiver argued to the court below, and argues now, that the Corvette was a Porobil asset covered by the trust; therefore, the proceeds from its sale should go to the receivership. While conceding that GMAC once had a valid security interest in the car, the Receiver insists that the chattel mortgage was extinguished when Hoerner tendered a cashier's check to GMAC in satisfaction of the debt. In support of his position, the Receiver cites La.Civ.Code Ann. art. 3411(4) (West 1952), which provides that mortgages are extinguished "[b]y the extinction of the debt, for which the mortgage was given." Reminding us that GMAC accepted Hoerner's check and authorized him to pick up the Corvette at the auto pound, the Receiver also points out "that consent of a mortgagee to the release or removal of mortgaged property destroys the validity of the securities as to third parties." *Glass v. McLendon*, 66 So.2d 369, 370 (La.App.1953).

GMAC responds with the allegation, the truth of which is not discernible from the record, that all of its troubles stem from its reliance upon the Receiver's assurances that he would not interfere with GMAC's executory proceedings against the Corvette. It also disputes the Receiver's interpretation of Louisiana law, submitting that the bank's disavowal of Hoerner's check, whether legally valid or not, precluded the immediate satisfaction of Porobil's debt. This, in conjunction with the Receiver blocking Hoerner's effort to pick up the car, produced a failure of consideration on both sides. Consequently, according to GMAC, the chattel mortgage remains intact.

The court below concluded that the bank acted improperly in stopping payment on the cashier's check. The court determined further that GMAC had committed a serious blunder in returning the check to Hoerner, thereby forfeiting its rights on that instrument, and choosing instead to attempt another forced sale of the car. While admitting that the Receiver's position on the extinction of GMAC's mortgage was arguable, the court chose to rely on what it described as the "practicalities" of the situation: acceptance of the Receiver's view would leave GMAC without any remedy. On weighing the equities, the court held that such a resolution would penalize GMAC too harshly. Accordingly, it ordered the Receiver to pay GMAC the $10,110.88 covered by the mortgage, with the $589.12 remainder from the sale falling into the receivership.

## II. The Law

Some understanding of the exalted position occupied by cashier's checks in our commercial law is necessary to a full appreciation of this peculiar cycle of events. The Receiver has maintained throughout this litigation—and GMAC does not seriously contend otherwise—that a cashier's check is as good as cash, and that a customer's order to a bank to stop payment on such a check is legally invalid. The district court agreed, quoting the following excerpt from R. Hersbergen, The Bank-Customer Relationship Under the Louisiana Commercial Laws, 36 La.L.Rev. 29, 41 (1975) (footnote omitted):

> A cashier's check is a draft drawn by a bank on itself. Neither the bank nor the customer can stop payment since the bank is not its own "customer" and the check is not "an item payable for [the customer's] account" under [La.Rev.Stat. Ann. § 10:] 4–403 [West Supp.1979]. Furthermore, courts may view cashier's checks as accepted in advance upon issuance, and therefore not subject to a stop order by virtue of [La.Rev.Stat.Ann. § 10:] 4–303(1)(a) [West Supp.1979].

The statutes mentioned above [1] convince us that this interpretation of Louisiana law is well-founded. Moreover, the Receiver's position on cashier's checks comports with basic hornbook commentary on the Uniform Commercial Code, from which Louisiana's commercial statutes were drawn. *See* La. Rev.Stat.Ann. § 10:1–101 Comment (West Supp.1981). In J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, 681–82 & n.110 (2d ed. 1980), the authors note that "[T]he public treats cashier's checks as the equivalent of cash." Moreover, "[i]f the bank voluntarily chooses to dishonor the certified or cashier's check or to order its bank to stop payment on the bank check, the holder will have a cause of action against the bank." [2]

As all who have ventured into the channels of commerce must quickly perceive, Hoerner's feat in getting the bank to stop payment on its check, which it had no right to do, and then getting GMAC to give back the instrument, on which it could have sued the bank, was barely short of heroic. Having thus escaped this financial Scylla and Charybdis miraculously unscathed, Hoerner disappears from our story with his $10,-110.88 in hand.

GMAC, by contrast, still confronts the Receiver's insistence that its mortgage evaporated with its acceptance of the now-vanished check in satisfaction of Porobil's debt. After reviewing the sparse authorities offered in support of the Receiver's

---

1. La.Rev.Stat.Ann. § 10:4–303(1)(a) (West Supp. 1981), provides as follows:

(1) Any knowledge, notice or stop-order received by, legal process served upon or set off exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the set off is exercised after the bank has done any of the following:
(a) Accepted or certified the item;

. . . . .

La.Rev.Stat.Ann. § 10:4–403(1) (West Supp. 1981), reads as follows:

(1) A customer may by order to his bank stop payment of any item payable for his account but the order must be received at such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to any action by the bank with respect to the item described in R.S. 10:4–303.

2. As the district court observed, this court similarly has delimited banks' authority to stop payment on cashier's checks in other jurisdictions:

A cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank.... As such, the Bank's liability on the check is governed by the Uniform Commercial Code, which was adopted in Florida in 1965 .... Under the Code, the Bank's issuance of the check, which by definition is also acceptance, constituted an engagement by the Bank to honor the check as presented ... extinguishing the right of the Bank, or anyone else to countermand the check.

*Pennsylvania v. Curtiss National Bank of Miami Springs, Florida*, 427 F.2d 395, 398–99 (5th Cir. 1970) (citations omitted).

position, we must agree with the district court that the Receiver's interpretation of Louisiana law on this issue is arguable, but only that.[3] The threshold question that both parties have sought to resolve is whether a third party's tender of a cashier's check on behalf of a mortgagor automatically extinguishes a chattel mortgage, even though the drawer/acceptor bank subsequently illegally dishonors the check at presentment. In other words, faced with the unexpected necessity of suing the third party's bank on the instrument offered in satisfaction of the debt, does the mortgagee retain, pending pursuit and satisfaction of its right against the bank, an alternative cause of action against the original debtor or his assets? It is scarcely a surprise that this particular issue is one that Louisiana courts have not had occasion to explore, and we shall not attempt to divine how they would resolve it.[4] Satisfied that this is hardly a case in which a federal court of equity has ridden roughshod over settled state law, we merely hold that the district court did not abuse its discretion in refusing to leave one of Porobil's secured creditors empty-handed.

**3.** In upholding the district court's determination that the Receiver's interpretation of article 3411(4) is only arguable rather than conclusive, we are mindful of our axiom that "when state decisional law affords no guidance, the interpretation of the district judge, who is well versed in the intricacies and trends of local law, is entitled to great deference." *Black v. Fidelity & Guaranty Insurance Underwriters, Inc.*, 582 F.2d 984, 987 (5th Cir. 1978).

**4.** We note that a Florida court has refused to recognize as an accord and satisfaction a cashier's check that the drawer/acceptor bank failed to pay. In *Cooper v. Wolkowitz*, 375 So.2d 1099 (Fla.App.1979), *cert. denied*, 388 So.2d 1111 (Fla.1980), the creditor accepted a cashier's check from the debtor and presented the debtor with a satisfaction of his mortgage. When the foreign bank refused to honor or even return the check, both the trial and appellate courts rejected the debtor's defense that the circumstances showed "an accord and satisfaction by the acceptance of performance by a third person, i.e. [the bank]." The Court of Appeals observed that "[t]he delivered check was an imaginary or, at least, an unreal substitution of payment." *Id.* at 1101.

In support of its decision, the court below quoted the following passage from *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980):

The federal courts have inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws. This circuit has repeatedly approved imposition of a receivership in appropriate circumstances. The power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief.

As the receiver points out, *Wencke* is distinguishable from the case at bar, both on its facts and in the breadth of its holding.[5] However, the district court relied on that decision only as a recent recognition, in the securities context, of the broad powers inherent in a federal court supervising an equity receivership. "It is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity

Certainly this decision, apart from its roots in the law of Florida, shows factual dissimilarities to the case before us. Notably, the instrument was drawn by a bank located in the British West Indies, and the bank never even returned the dishonored check. Nevertheless, it bolsters our skepticism toward appellant's insistence that acceptance of a cashier's check automatically snuffs out a mortgage, regardless of the subsequent difficulties encountered in obtaining payment on the check. As the court concluded in *Cooper*, "[e]quity will look beyond form to the true intent of the parties in applying equitable remedies." *Id.*

**5.** *Wencke* involved the much broader question of a federal court's power to enjoin nonparty state actions against receivership assets. The Ninth Circuit held that the district court, which had appointed a receiver in a securities fraud action, had not abused its discretion in issuing a blanket stay prohibiting all persons from commencing any suit against the receivership entities, nor in denying a creditor's motion for permission to enforce a prior state court judgment and complete a second prior state court proceeding against a receivership entity. *See Wencke*, 622 F.2d at 1369–74.

receivership." *SEC v. Lincoln Thrift Association*, 577 F.2d 600, 606 (9th Cir. 1978). Therefore, "[a]ny action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." *SEC v. Arkansas Loan & Thrift Corp.*, 427 F.2d 1171, 1172 (8th Cir. 1970).

The district court's disposition of the proceeds from the Corvette was fair to all and certainly constituted no abuse of discretion. Once confronted by the dishonored cashier's check, GMAC had the option of suing the bank for Hoerner's money or reviving its efforts under the summary procedure for foreclosure. As the court below noted, it may have acted imprudently (though, perhaps, not to its discredit) in returning Hoerner's check to him and forfeiting its rights against the bank. But this does not mean that it deserved no consideration in the court's equitable allotment of the proceeds. In asking us to substitute his view of equity for that of the court, the Receiver argues as though GMAC's blunder had cost the receivership assets to which it (the receivership) was otherwise entitled. He admits that GMAC held a valid security device prior to the appearance of Hoerner. Apparently, however, the Receiver envisioned a scenario in which GMAC obtained Hoerner's money, the Receiver seized the Corvette clear of encumbrance, and Hoerner, an unsecured claimant, slipped silently to the end of the line occupied by Porobil creditors. Since the Receiver can claim no equitable right to such a windfall, we fail to understand his cry of havoc in the wake of his supervisory court's decision.

The Receiver, in fact, predicts that a commercial donnybrook will follow from this decision: receiverships will fall prey to the most inept of claimants and "even the most sacred business tools (such as a cashier's check)" will become violable. Wishing to stave off such an apocalypse, we emphasize that our holding stands on the peculiarity of the facts before us and the wide discretionary powers that we accord to a court of equity charged with overseeing a receivership. Indeed, in view of the concern for orderly administration that underlies this traditional grant of discretion, we wonder whether we would not conjure greater chaos by encouraging receivers to contest a supervisory court's decision any time an arguable objection lies at hand. As the first Justice Harlan wrote in *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 371, 28 S.Ct. 406, 409, 52 L.Ed. 528 (1908) (quoting *Booth v. Clark*, 58 U.S. (17 How.) 321, 322, 331, 15 L.Ed. 164 (1855) (citation omitted)), "It is the court itself which has the care of the property in dispute. The receiver is but the creature of the court; he has no powers except such as are conferred upon him by the order of his appointment and the course and practices of the court." This being so, we will not favor the creature's challenge to the creator's power absent the clearest abuse of discretion.

The order below is

AFFIRMED.